UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SCOTT BANTIEN and
SANDRA BANTIEN,

       Plaintiffs,

vs.                                             Case No.

ZURICH AMERICAN
INSURANCE COMPANY,                HON.

       Defendant.

---

Troy W. Haney (P48614)
HANEY LAW OFFICE, P.C.
Attorney for Plaintiff
330 East Fulton Street
Grand Rapids, MI 49503
Telephone:    616-235-2300
Facsimile:     616-459-0137
Email:  thaney@troyhaneylaw.com

---

## COMPLAINT

Plaintiffs, Scott Bantien and Sandra Bantien, by their attorney, Troy W. Haney of Haney Law Office, P.C., and for their complaint against Defendant, Zurich American Insurance Company, states as follows:

### Nature of Action and Jurisdiction

1. This is a civil complaint brought by Plaintiffs, Scott Bantien and Sandra Bantien ("Plaintiffs"), under the Employee Retirement Income Security Act ("ERISA"), §502, 29 U.S.C. 1132, regarding breach of the terms of an employee benefit plan and breach of fiduciary duties, for the purpose of compelling Defendant to provide certain accidental injury insurance benefits in amounts and at the coverage levels promised and for an

accounting, recovery of damages, costs, and attorney fees incurred as a consequence of Defendant's breaches of its obligations and duties under ERISA as detailed herein.

2. This Court has subject jurisdiction over Plaintiffs' claims pursuant to ERISA §502(e) and (f), 29 U.S.C. 1132(e) and (f) and 28 U.S.C. 1331.

3. Venue properly lies in this District pursuant to ERISA §502(e)(2), 29 U.S.C. 1132(e)(2).

## Parties and General Allegations

4. At all relevant times, Plaintiff Sandra Bantien ("Sandra") was a participant, as defined by ERISA §3(7), 29 U.S.C. 1002(7), in the "UBS Financial Services Inc. Group Health and Welfare Benefits Plan" ("the Plan") provided by UBS Financial Services, Inc. ("UBS") to its eligible employees, including Sandra Bantien, administered and funded by an insurance policy issued by Defendant, Zurich American Insurance Company ("Zurich"), for group accident benefits as group policy no. GTU-3514165, ("Group Accident Policy").

5. At all relevant times, Plaintiff Scott Bantien ("Scott") was a beneficiary, as defined by ERISA §3(8), 29 U.S.C. 1002(8), of the Group Accident Policy, and is the individual who suffered an accidental injury which is the subject of this Complaint.

6. At all relevant times, the Plan was an employee welfare benefit plan within the meaning of ERISA §3(1), 29 U.S.C. 1002(1), sponsored by UBS and funded by the above-referenced insurance policy issued by Zurich. As such, Zurich is the proper party to defend this matter and the sole entity responsible for the payment of claimed benefits set forth below.

7. At all relevant times, Zurich was the fiduciary of the Plan within the meaning of ERISA §3(21), 29 U.S.C. 1002(21), in that Zurich acted as a claims administrator and as a fiduciary for the Plan and exercised authority and control over the payment of accidental injury

benefits, which are assets of the Plan. Pursuant to 29 C.F.R. §2560.503-1(h)(1), Zurich, therefore, functioned as an administrator for claims procedure purposes.

## Facts

8. At all relevant times, Scott was a beneficiary under the Group Accident Policy as the spouse of Sandra, who was a fully-covered participant and who had elected family coverage under the Group Accident Policy.

9. In August 2013 Scott was employed as a Semi-Driver / Heavy Equipment Operator for De Sal Excavating, and has had a similar work-history going back to 1999.

10. On April 28, 2017, Scott slipped while entering a semi-truck and injured his left arm and shoulder and suffered what is referred to as a "SLAP" tear[1].

11. As a result of Scott's injury, he has been unable to perform his work duties or any other type of work duties since the date of the accident due to the inability to use his left arm without triggering severe pain.

12. As a result of Scott's injury, he is restricted from using his left arm for lifting over 5 pounds; no overhead work above the shoulder; and no reaching greater than 18 inches from his body. He is also unable to drive or operate equipment, he requires help with cooking meals, putting on socks, shoes, boots, and coats, and can no longer do housework or yardwork. Also, due to the disorientation and drowsiness from his narcotic pain medications, he can only stay awake for short periods of time.

13. At issue in this case is the "Permanent and Total Disability Benefit" included as part of the Group Accident Policy, which is described as follows:

> If an **Insured** becomes **Permanently and Totally Disabled** as a result of a **Covered Injury**, **We** will pay a **Permanent and Total Disability Benefit** provided

---

[1] A SLAP tear is an injury to the labrum of the shoulder, which is the ring of cartilage that surrounds the socket of the shoulder joint. (https://orthoinfo.aaos.org/en/diseases--conditions/slap-tears/)

> that he or she becomes **Permanently and Totally Disabled** within 365 days of the **Injury**; and the **Permanent and Total Disability** continues for twelve (12) months. * * *
>
> For purposes of this benefit, **Permanently and Totally Disabled** means that the **Insured** is totally and continually disabled and cannot work, for any income, at any job that he or she is reasonably suited by education, training or experience to do. **Permanent and Total Disability** must be verified by a competent medical authority, and must be expected to continue for the remainder of the **Insured's** life. (Emphasis in original).

14. In the months following Scott's injury, he was prescribed medications, injections, and physical therapy – all of which failed to relieve his severe pain.

15. On March 19, 2018, Scott underwent surgery on his shoulder, which resulted in the following findings:

> **PROCEDURES PERFORMED:**
> Left arthroscopic long head biceps tenodesis, arthroscopic distal claviculectomy, and arthroscopic acromioplasy.
>
> **POSTOPERATIVE DIAGNOSES:**
> Left superior labrum anterior to posterior tear, shoulder impingement syndrome, acromioclavicular arthritis, incomplete nontraumatic rotator cuff tear.
>
> **FINDINGS:**
> …The labrum was detached from the 11 o'clock to 1 o'clock position superiorly. The biceps root was unstable at the supraglenoid tubercle… The supraspinatus undersurface exam there was some mild fraying here and partial-thickness articular-sided tear within the mid substance of the crescent portion of the supraspinatus tendon… Subacromial space demonstrates thickened bursal tissue. There was fraying of the coracoacromial ligament and anterior attachment to moderate subacromial spur. The acromioclavicular joint demonstrates degenerative changes with small and infraclavicular spurs.

16. After undergoing surgery, Scott attempted further physical therapy and additional injections, but without success at relieving his pain or giving him any greater function of his left arm.

17. On September 19, 2018, Scott had a follow-up visit with his Orthopedic Surgeon, Dr. Jeffrey Recknagel, who included in his notes the following:

> IMPRESSION: Persistent left shoulder pain in part attributable to chronic dysfunction of the rotator cuff. The patient is now 6 months status post arthroscopic left long head biceps tenodesis, acromioplasty, distal claviculectomy. * * *

4

> TREATMENT PLAN: In terms of this patient's left shoulder, I suspect we are at maximum medical improvement. He continues to have significant rotator cuff dysfunction and it is not clear whether we will see this improve over time given the nature of extensive treatment here. My recommendation at this point is to make his restrictions permanent. His restrictions are left upper extremity no lifting greater than 5 pounds, no above shoulder work, no reaching greater than 18 inches from his body. I will see him as needed for his shoulder.

18. Upon information and belief, in October 2018 the Plaintiffs attempted to file a disability claim for Scott, but were directed by the UBS Human Resources Department to file the claim under the Long Term Disability Policy, which unknown to the Plaintiffs at the time did not provide coverage for Scott, and was a different policy than the Group Accident Policy.

19. On January 2, 2019, the Plaintiffs submitted a new claim form to Zurich along with an Attending Physician Statement from Dr. Recknagel, which confirmed that Scott was totally and permanently disabled from working.

20. According to the terms of Summary Plan Description for the Group Accident Policy, Zurich was required to make a decision within a maximum of 105 days of the claim being filed, or by April 17, 2019.

21. Upon information and belief, the Plaintiffs' claim form was correctly submitted under the Group Accident Policy, but was incorrectly processed by Zurich as a "Loss of Use" claim, which is a different benefit within the Group Accident Policy than the "Permanent and Total Disability" benefit.

22. As a result of the Scott's inability to return to work - in any capacity - he applied for and was awarded Social Security Disability Insurance ("SSDI") benefits on January 6, 2019, with an effective date of benefits starting on July 1, 2018.

23. As of January 2, 2020, twelve (12) months had passed since the Plaintiffs made the initial claim for disability benefits from the Group Accident Policy, and Zurich had not yet reached an official decision on Scott's claim.

24. On January 17, 2020, a Zurich representative, Kathy Kelsch, a Claims Specialist III in the Accident and Health Special Risk Technical Claims Division, issued a letter to Scott and incorrectly informed him that he was not covered by the policy.

25. In May 2020, Sandra contacted a representative from the UBS Human Resources Department to further assist with Scott's claim, who then contacted Ms. Kelch by email. Ms. Kelch responded by email and stated that the claim had been incorrectly processed as a "dismemberment/loss of use" claim, and that Zurich had determined that Scott did not qualify for that benefit. Ms. Kelsch also stated that a new claim had been submitted for disability, but that this would also require the start of a new review process.

26. As of July 2, 2020, eighteen (18) months had passed since the Plaintiffs made the initial claim for disability benefits from the Group Accident Policy, and the Defendant had not yet reached an official decision on Scott's claim.

27. On October 9, 2020, Zurich had a paper-file review completed by an Orthopedic Surgeon, Dr. John Siegart, who did not speak with or conduct a physical examination of Scott, nor did he discuss Scott's condition with any of his attending physicians. According to Dr. Seigart's report, his opinion was that Scott was not totally and permanently disabled due to his shoulder injury, and that his disability was related to a pre-existing degenerative process.

28. On November 13, 2020, Zurich submitted a copy of Dr. Siegart's report to Dr. Recknagel, and requested that he review the report and advise if he agreed or disagreed with the

findings within the report.

29. On December 9, 2020, the undersigned submitted a letter to Zurich, informing them that Scott and Sandra were now being represented by the undersigned; requesting a copy of the claim file; and requesting an update regarding where Zurich was within its review process and when a final decision would be made on Scott's claim.

30. As of January 2, 2021, twenty-four (24) months had passed since the Plaintiffs made the initial claim for disability benefits from the Group Accident Policy, and the Defendant had not yet reached an official decision on Scott's claim.

31. On January 14, 2021, Zurich issued a letter to the undersigned, stating that it was still reviewing Scott's claim and was waiting for a response from Dr. Recknagel, and also purporting to have provided a copy of the claim file – however, neither the letter nor the claim file was received by the undersigned.

32. On February 2, 2021, the undersigned submitted a second letter to Zurich, once again requesting a copy of the claim file and an update on when Zurich would be making a final decision on Scott's claim.

33. On March 6, 2021, Zurich issued a letter to the undersigned, stating that the claim file had been submitted previously be email, and claiming to now provide another copy of the claim file – however, no files were received by the undersigned at this time. The letter also stated that Zurich was still waiting for a response from Dr. Recknagel to Dr. Siegart's report, although it had now been nearly four months since the initial request for his response.

34. On March 11, 2021, the undersigned submitted a third letter to Zurich, once again requesting a copy of the claim file and an update on when Zurich would be making a final decision on Scott's claim.

35. On March 15, 2021, the undersigned issued a letter to Zurich, acknowledging receipt of Zurich's letter from March 6, 2021, but informing Zurich that no claim file had yet been received, and also making a fourth request for an update on the status of Scott's claim.

36. On March 19, 2021, the undersigned submitted a fifth letter to Zurich, acknowledging that the claim file had now been received by email, but also to inquire if Zurich was still waiting for a response from Dr. Recknagel, and to request a status update on when Zurich expected to make a decision Scott's claim.

37. On April 13, 2021, the undersigned submitted a sixth and final letter to Zurich, once again requesting information on the status of Dr. Recknagel's response, and requesting Zurich to advise when a decision would be made on Scott's claim.

38. As of this filing, nearly 2 ½ years have passed since the Plaintiffs made the initial claim for disability benefits from the Group Accident Policy, and the Defendant has not yet reached an official decision on the Plaintiff's claim, nor have they responded to multiple requests from the undersigned regarding an expected timeframe for when a final decision could be expected.

39. In accordance with 29 C.F.R. § 2560.503(l)(1)(2)(i) of the Department of Labor Regulations, and due to the unreasonable delay of nearly 2 ½ years since the Plaintiffs filed the initial claim under the Group Accident Policy, the Plaintiffs now consider Zurich's failure to make a final determination on Scott's claim as a "deemed denial" of the claim.

### COUNT I
### Claim for Benefits Pursuant to ERISA §502(a)(1)(B),
### 29 U.S.C. 1132(a)(1)(B) against Defendant

40. Plaintiff incorporates paragraphs 1 through 39 above as if fully restated herein.

41. ERISA §502(a)(1)(B), 29 U.S.C. 1132(a)(1)(B) permits a plan beneficiary to bring a civil action to recover benefits due to him under the terms of a plan, to enforce his rights under the terms of a plan and/or to clarify his rights to future benefits under the terms of a plan.

42. The failure to pay full disability benefits under the Group Accident Policy as described above are in direct violation of the terms of the Plan.

43. The Plan has failed to pay disability benefits to Scott Bantien despite the recommendations of his physicians and his permanent and total disabling medical conditions.

44. The failure and refusal of the Plan to pay the benefits owed Scott Bantien under the Plan is a breach of the terms and provisions of the Plan.

45. In addition, the Plan has failed to properly and thoroughly investigate Scott Bantien's claim in the manner required by ERISA's fiduciary and claims procedure requirements.

46. Furthermore, the Plan has failed to properly make a final decision on Scott Bantien's claim in a timely manner, as required by the terms of the Plan and by ERISA's fiduciary and claims procedure requirements.

47. The actions of the Plan have caused damage to Scott Bantien in the form of the denial of permanent and total disability benefits from the Group Accident Policy.

48. In addition, because the Plan has failed to approve the payment of Scott Bantien's permanent and total disability benefits, he has also not been approved for other benefits provided through the Plan such as waiver of premiums.

**PRAYER FOR RELIEF**

Plaintiff requests that this Honorable Court grant the following relief:

A. A declaratory judgment pursuant to ERISA §502(a)(1)(B), 29 U.S.C. 1132 (a)(1)(B) and 28 U.S.C. 2201, declaring that Plaintiff Scott Bantien is entitled to the group benefits in the proper amounts as set forth in the Plan in effect at the time benefits became payable

   and that Defendant has violated the Plan and its fiduciary duties by failing to pay these benefits and honor the group waiver of premiums.

B. A full and accurate accounting by Defendant of all computations for Plaintiff Scott Bantien's beneficiary benefits, in sufficient detail so that he may ascertain that his benefits are being paid in the proper amount.

C. An Order compelling Defendant to pay Plaintiff Scott Bantien forthwith the full amount of beneficiary benefits due to him, including interest on all unpaid benefits.

D. An Order awarding reasonable attorney fees and costs pursuant to ERISA §502(g)(1), 29 U.S.C. 1132 (g)(1).

E. Such other relief as may be just and appropriate.

Dated: June 23, 2021          */s/ Troy W. Haney*
                   Troy W. Haney (P48614)
                   HANEY LAW OFFICE, P.C.
                   Attorney for Plaintiff
                   330 East Fulton Street
                   Grand Rapids, MI 49503